WO

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

John E. Trammell, an individual, )
        Plaintiff, )
)   CV 08-338 TUC DCB
v. )
)   O R D E R
Raytheon Missile Systems, )
        Defendant. )
_____)

The Court denies Plaintiff's Motion to Strike (doc. 94) new arguments and additional facts from Defendant's Reply as moot. The Court's decision is not based on any of the challenged arguments or facts. The Court grants the Defendant's Motion for Summary Judgment (doc. 80).

**Plaintiff's Complaint**

Plaintiff began working for Raytheon in Honolulu, Hawaii, in 2001. He had a "Secret" security clearance and at all times performed well with annual performance reviews of "meets" or "exceeds" expectations. In 2002, Plaintiff was diagnosed as suffering from depression. Plaintiff takes medication for depression, which includes a sleeping aid. In 2006, Plaintiff's marriage ended in divorce, and he transferred to Raytheon's Tucson operation around mid-2006. (Plaintiff's Response to Motion for Summary Judgment (P's Response to MSJ), Statement of Facts (SOF) ¶¶ 5-14, 16.)

While still in Hawaii, Plaintiff, who had gambled all his life, began gambling more aggressively as his depression worsened over the break-up of his marriage. In the fall of 2005, he received $30,000 in "markers" from the Stardust Hotel and Casino in Las Vegas, which he

could not repay. The Stardust took action against him, which ultimately resulted in an arrest warrant being issued for him on a criminal complaint for larceny. *Id.* ¶¶ 14-15, 30.)

On May 6, 2007, Plaintiff was involved in a very serious car accident, which resulted in the death of occupants in the other vehicle. During the accident investigation, for which he was not cited, the warrant was discovered and he was arrested. On May 7, 2007, Plaintiff was released after providing the name of his employer and immediate supervisor to police. Plaintiff flew to Las Vegas, paid the money owed on the criminal complaint, and all charges against him were dismissed. *Id.* ¶¶ 32-35.

On May 14, 2007, he met with Defendant's human resource officer and head of security, and provided them with information regarding his arrest, gambling activities and related issues. They offered him professional counseling. On May 18, 2007, Plaintiff again met with his superiors at Raytheon, who questioned him about why he had not previously informed them about the warrant and gambling issues. *Id.* ¶¶ 36-37, 37A. He explained he had made disclosures to the Department of Defense security investigator for Raytheon the previous month. He requested professional assistance. *Id.* ¶¶ 17,18-25, 18A,.31. Instead, Defendant terminated Plaintiff's employment. *Id.* ¶¶ 39-42.

Plaintiff alleges Defendant violated the American's with Disabilities Act (ADA) and the Arizona Civil Rights Act (ACRA)[1] because it terminated his employment based on his disability, major depression, which in his case manifested itself as compulsive gambling.

**Defendant's Motion for Summary Judgment**

Defendant argues the Court should enter summary judgment in its favor because Plaintiff can not make a *prima facie* case of discrimination under the ADA because compulsive

---

[1] The Court's ADA analysis applies to Plaintiff's ACRA claim. If Plaintiff's claim does not survive under federal law, summary judgement is proper as to his state law claim as well. *See Francini v. Phoenix Newspapers Inc.*, 937 P.2d 1382, 1388 (Ariz. App. 1996) (ACRA is modeled after federal employment discrimination laws); *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir. 1997) (ADA expressly adopts enforcement provision of Title VII, including relevant portions of ACRA); *Cook, Perkiss & Liehe*, 911 F.2d 242, 247 (9th Cir. 1990) (when summary judgment is granted on federal claims, the Court has discretion to dismiss pendent state claims as well).

gambling is expressly excluded under the ADA, and Plaintiff's depression does not substantially limit him in any recognized major life activity. Plaintiff is not a "qualified individual with a disability" because he cannot perform the fundamental job duties of his position which requires trustworthiness. The Court does not reach these arguments. The Court is persuaded by Defendant's argument that the Plaintiff was not terminated because of his disability because Raytheon did not know he suffered from depression until after the termination. Therefore, the Court does not need to reach Defendant's final argument that even if Plaintiff can make out a *prima facie* case of disability discrimination, Defendant had a legitimate, nondiscriminatory reason for terminating his employment. Plaintiff's gambling issues and complete lack of candor with respect to same violated Raytheon's clearly articulated and well-known reporting procedures, and demonstrated that he could not hold a security-sensitive position in which trust is a fundamental job requirement. (D's MSJ at 2.)

"Under the ADA, the term 'disability' means '(a) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (b) a record of such an impairment; or c) being regarded as having such an impairment.'" (P's Response to MSJ at 8 (citing 42 U.S.C. § 121012(2) (1994); 29 C.F.R. § 1630 2(g) (1996)).

It is undisputed for purposes of this motion that depression qualifies as a mental impairment. To be a disability under the ADA, Plaintiff's depression must have substantially limited one or more major life activities, such as learning, thinking, concentrating, interacting with others, caring for oneself, speaking, performing manual tasks or working. Sleeping is also a major life activity that may be limited by mental impairments. The impairment must last for more than several months, but chronic, episodic conditions may also constitute substantially limiting impairments if they are substantially limiting when active. *Id.* at 8-9 (statutory citations omitted).

Plaintiff attests that his condition became "so poor by March 2007 that [he] couldn't sleep, despite [his] medication for same," that he was having trouble getting up in the morning and was getting to the office later than usual, that he "became withdrawn and wasn't eating properly." He was taking his medications for depression, "but they weren't working!" *Id.* at

9. Plaintiff's own declaration regarding his impairment and the manner and degree it impairs him may be sufficient to raise a genuine issue of material fact. *McAlindan v. County of San Diego*, 192 F.3d 1226, 1235 (9th Cir. 1999); *Head v. Glaicer*, 413 F.3d 1053, 1058 (9th Cir. 2005). However, self-serving and conclusory statements are insufficient to survive summary judgment. *Fraser v. Goodale*, 342 F.3d 1032, 1040 (9th Cir. 2004). Here, the only evidence is Plaintiff's testimony, which lacks specificity regarding the severity of his sleep disorder and how long it lasted before it was again corrected by his medication. Nevertheless, for purposes of Defendant's Motion for Summary Judgment, the Court will treat the Plaintiff's impairment as substantially limiting his ability to sleep normally.

Dr. Johnson, Plaintiff's expert, opines that the Plaintiff "suffers from major depression and pathological gambling. He contends the increased gambling activities which gave rise to Mr. Trammell's financial difficulties in the last three years prior to his termination were caused by his worsening depression. He also explained that Mr. Trammell's depression also exacerbated his difficulty expressing his emotions and feelings and his decision-making." (P's Response to MSJ at 9) (citations omitted).

Congress expressly excluded compulsive gambling, along with various sexual disorders, kleptomania, pyromania, and psychoactive substance use disorders resulting from current drug use, from the ADA's definition of disability, (P's Response to MSJ, SOF, Ex. 2: EEOC Enforcement Guidance on the ADA at 3 n.8.) To prevail, the Plaintiff must establish that he was terminated because of his depression. If Raytheon lacked actual knowledge of Plaintiff's disability, as a matter of law Raytheon could not have fired him because of it. (D's MSJ at 19 (citing *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005); *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)).

An employee is not required to give notice to an employer that he is disabled because there are real concerns that there may be potential negative consequences from disclosing a psychiatric disability. (P's Response to MSJ, Ex. 2: EEOC Enforcement Guidance at 12.) However, an employer's duty to accommodate an employee's disability is triggered by the

employee's request for a reasonable accommodation. 42 U.S.C. §§ 12112(b)(5)(A) (1994). So, at least, an employee must disclose his disability when requesting an accommodation. There are no magic words required for requesting an accommodation. *Schmidt v. Safeway, Inc.*, 864 F. Supp. 991, 997 (Or. 1994). For example, "[a]n employee asks for time off because he is 'depressed and stressed.' The employee has communicated a request for a change at work (time off) for a reason related to a medical condition (being 'depressed and stressed') may be 'plain English' for a medical condition)." (P's Response to MSJ, Ex. 2: EEOC Enforcement Guidance at 19.) On the other hand, "[a]n employee asks to take a few days off to rest after the completion of a major project. The employee does not link her need for a few days off to a medical condition. Thus, even though she requested a change at work (time off), her statement is not sufficient to put the employer on notice that she is requesting reasonable accommodation." *Id.* at 20.

Plaintiff submits that he requested accommodation from Raytheon on multiple occasions in March 2007, when he met with his immediate supervisor, Mr. Steve Ignat, and again in May 2007, after his arrest when he met with Mr. Robert Cavazos, head of Raytheon's security, Mr. Richard Stotlar, the manager of human resources, and Mr. Dennis Carroll, the Vice-President of Business Development for Raytheon Missile Systems. (P's SOF ¶ 29, 40.) According to the Plaintiff, he told Mr. Ignat that he was under extreme stress because of his divorce and was having financial difficulties because of the divorce and his house in Hawaii had not sold due in large part because of a problem caused by a company, Cartus, hired to assist in Plaintiff's relocation from Hawaii to Tucson. *Id.* ¶¶ 29, 40. After his arrest on the gambling warrant, the Plaintiff specifically asked Mr. Carroll to allow him to get professional counseling. *Id.* ¶ 37.

Traits and behaviors, like stress, irritability, chronic lateness, and poor judgment, in themselves are not mental impairments, but they may be related to a mental impairment. (P's Response to MSJ, Ex. 2: EEOC Enforcement Guidance on the ADA at 4.) Misconduct, even if the misconduct resulted from a disability, is not excused and an employer may discipline an individual with a disability provided that the workplace conduct is job-related for the position in question and is consistent with business necessity. In other words, Raytheon did not violate

the ADA if it would have terminated an employee without a disability for a gambling debt resulting in the employee's arrest and for not being truthful and forthcoming about it. Additionally, an employer's duty to reasonably accommodate a disability is always prospective, and an employer is not required to excuse past misconduct. *Id.* at 31-32. So for example, if an employee has a hostile altercation with his supervisor and threatens the supervisor with physical harh, the employer may immediately terminate the individual's employment, consistent with its policy of immediate termination of anyone who threatens a supervisor. Upon being terminated, the employee may ask the employer to put the termination on hold and give him a month off for treatment instead. If this is the employee's first request for an accommodation, it is too late. The employer is not required to rescind the discharge under these circumstances because the individual is no longer a qualified individual with a disability. *Id.* at 32.

Plaintiff is correct that nowhere has it ever been asserted by Raytheon that an employee cannot gamble outside of work. (P's Response to MSJ at 11.) The Plaintiff is not, however, correct that the misconduct provisions and/or exclusion for compulsive gambling under the ADA are not applicable. *See* P's Response to MSJ at 10 (recognizing that the Ninth Circuit rejected the finding in *Teahan v. Metro-North Commuter Railroad Comp.*, 951 F.2d 511 (2nd Cir. 1991) that conduct directly resulting from a disability is considered to be part of the disability). The Court will assume that the escalated gambling behavior, which Plaintiff's expert describes as the conduct at issue here, like his using poor judgment or being stressed, were all related to his mental health disability, but to be determinative the Defendant must have known this. The Court has read Plaintiff's deposition testimony,[2] the depositions of his immediate supervisor, the human resource officer, the head of Raytheon's security, and the Vice-President of the Business Development department, and the letter Plaintiff sent Raytheon explaining his problem after his arrest. The Court has focused on what Plaintiff attests he told these individuals.

---

[2]Plaintiff's answers to interrogatories reflect the same.

By way of background, Plaintiff explained that he knew he had a gambling debt, but until he was told in January 2007 by the DOD that there was a warrant issued in Nevada for his arrest because he owed the Stardust Casino $30,000, he did not perceive it as adverse information subject to Raytheon's reporting requirements. He believed his explanation to DOD that he would pay it off when he sold his house in Hawaii satisfied DOD. (P's Response to MSJ, SOF, Ex. B: Trammell Depo. at 65-66.) When asked what else there was in 2007 in his life that was adverse, he replied:

> . . . I will use the word trauma of what I experienced both with my marital problems, my mortgage problems, my financial difficulties, my legal fees I was paying to the divorce lawyer, and then trying to maintain an $8,000 a month expense for the house in Hawaii at the same time acquiring expenses down here, I will say Raytheon was very good to me in that the first six months I was in Tucson, they put me up in a hotel. . . . Since the house hadn't sold, I requested a further extension of that and I was denied. And, therefore, now I had another monthly expenditure. And although in the big picture, it doesn't – it's the fact that the house hadn't sold that was my biggest problem because I had a negative cash flow at the time.

*Id.* at 66.

In addition to the gambling debt, which he incurred in 2005 before ever leaving Hawaii, the Plaintiff explained that as "[his] divorce proceeded further and got uglier and uglier and [his] legal expenses were more frequent, that's when [he] started to feel the stress. Even at the end of when [he] was in the hotel, [he] borrowed some money from his sister to pay his lawyer. *Id.* at 103. Plaintiff admitted that he attended Gamblers Anonymous in Hawaii, but upon arriving in Tucson he quit going, and he never reported to anyone at Raytheon that he had attended Gamblers Anonymous. He felt it was not relevant, and he was taking care of the problem. *Id.* at 104.

He did report to Mr. Ignat that he was "totally stressed out, that his finances weren't in order and he was in a very depressed state." So, Plaintiff believed he did mention depression to Mr. Ignat. *Id.* at 111.

When the sale of Plaintiff's house in Hawaii fell through, Plaintiff met with the head of the department, Mr. Carroll, to discuss problems with Cartus, a company hired by Raytheon to assist in his relocation. Plaintiff told Mr. Carroll that he was having "severe financial

difficulties and stress and the fact that Cartus had made these unbelievable mistakes." Plaintiff was referred to the legal department. *Id.* at 114.

When asked whether he had informed Mr. Ignat, his supervisor, about his arrest on the warrant, he said he initially informed Mr. Ignat that he needed some time off to go take care of some personal issue, which was to pay off the $30,000 gambling debt. *Id.* at 87-88. After he returned from Las Vegas, he met with the human resource officer, Mr. Statlar, and Mr. Cavazos, Raytheon's security manager. *Id.* at 89. They discussed the gambling debt, and the Plaintiff described himself as a "whale," which is someone who gambles large amounts in casinos. *Id.* at 90. During this first meeting on May 14, 2007, Mr. Statlar asked the Plaintiff if he needed professional counseling to address "the accident, the loss of life, and everything else he was going through." But Plaintiff cannot recall whether he told Mr. Statlar or Mr. Cavazos that he was suffering from depression. *Id.* at 129.

To summarize, Plaintiff explained he continued to take his anti-depressant medication, but with the continued financial difficulties and the other stressors with the divorce and everything, he was just overwhelmed. *Id.* at 142. Plaintiff described himself as always having been able to keep his condition under control with medication and cope for the most part with his personal life. But with the divorce and living expenses mounting, his depression increased in magnitude. *Id.* at 153-54. He was still in control until about March when his legal fees began to mount, and he began having difficulty sleeping and eating. *Id.* at 154. Plaintiff believed that his communications with Mr. Ignat would have led to the conclusion that he was having significant problems coping, and Mr. Ignat should have realized he was extremely stressed and anxious. *Id.* at 155. The Court finds this is consistent with Mr. Ignat's understanding that Plaintiff's financial issues were specific to the inability to sell his house in Hawaii. (P's Response to MSJ, SOF, Ex. K: Ignat Depo. at 71, 80.) Specifically, Plaintiff asked for and was granted time off to go to Hawaii, *id.* at 80, to work out issues in relation to selling the house, *id.* at 84.

After the car accident involving the fatality and his arrest, he specifically asked for professional counseling. He did not ask to see a financial advisor but wanted "professional help

to turn [his] life around." *Id.* at 158. He believes his supervisor and Mr. Carroll knew he was in marital discord and he was "basically a mess." *Id.* at 162. He believes he was terminated because Defendant believed he would loose his security clearance due to excessive gambling. *Id.* at 105, 151.

On May 15, 2007, Plaintiff wrote a letter of explanation, as follows:

> I'm currently going through a divorce, with my wife living in our home in Aiea, Hawaii. Since transferring to Tucson, I have been making the Hawaii mortgage & utility payments ($7,400 + 600 utilities) along with my living expenses here in Tucson. This has been a very stressful time in my life with respect to finances as I've been operating with a negative cash flow each and every month since coming to Tucson. The house has finally been sold ($1,265, 000) after 8 long months on the market and the escrow process is underway. After paying off the mortgages and the already agreed to divorce settlement to my wife []. . . . After the April, 2006 gambling incident with the Stardust, I voluntarily enrolled in the Honolulu, Hawaii chapter of Gamblers Anonymous (GA). . . . I also attended a GA meeting at the Tucson Medical Center on a Wednesday evening soon after arriving; however, I did not continue to attend as I did in Hawaii. After surviving my recent accident without injury when two other individuals lost their lives, I definitely will need some form of grief counseling in the near term. In addition, I will be attending at least two GA meetings a week in the evenings at the Tucson Medical Center for the foreseeable future. . . . Please allow me the opportunity to make some much needed lifestyle changes . . .

(P's Response to MSJ, SOF, Ex. Q: Letter.)

The Court finds that there is no evidence to even suggest Defendant knew or even should have known that Plaintiff even suffered from depression. Even in his deposition, the Plaintiff used the terms "stressed" and "depressed" in the context of his divorce and financial affairs. There is nothing in the record to suggest he ever even hinted to Defendants that he had ever been diagnosed with depression, suffered from and was being treated for depression, nor identified his stress, depressed metal state or anxiousness with this mood disorder. Plaintiff's post-arrest request for professional help was aimed at "turning his life around" in the context of compulsive gambling and grief counseling.

Plaintiff submits that Defendant may have discovered Plaintiff suffered from depression as a result of information he reported as part of his DOD security review in August, 2006. He met with Raytheon employee, Janet Montgomery, and she assisted him in preparing his 2006 "e-QIP," which is the electronic questionnaire that begins a periodic reinvestigation required for all security clearances, on which he disclosed that he had consulted with a mental health

- 9 -

professional within the last 7 years. He executed written authorizations for the DOD to obtain documentation and background information, including his financial and healthcare records. (P's Response to MSJ at 3.) The e-QIP, however, provided very limited information because separate entries for treatment are only necessary for consultations not involving marital, family, or grief counseling, and related to violence. Additionally, any information Ms. Montgomery may have had cannot be imputed to the Raytheon employees involved in terminating Plaintiff's employment because the National Industrial Security Program Operating Manual (NISPOM) precludes any Raytheon employee who reviews an e-QIP from sharing information from the e-QIP within the company and precludes use of any e-QIP information except to determine the adequacy and completeness of it. (P's SOF ¶ 20, Ex. H: NISP Operating Manual § 2-202(a).)

## **Conclusion**

Plaintiff's theory of the case is that compulsive gambling is synonymous with depression. Plaintiff argues that in his case, there are not two distinct psychological conditions because his mood disorder manifested itself as a gambling addiction. Unless there is proof the Defendant knew of this manifestation, the Court rejects this approach given the ADA's express exclusion of compulsive gambling as a disability. In other words, Plaintiff's proof that his compulsive gambling is associated with major depression and proof he was terminated because of compulsive gambling does not *a fortiori* prove he was terminated due to the mood disorder, depression. To survive summary judgment, Plaintiff needs evidence to dispute Defendant's assertion it had no knowledge that the Plaintiff suffered from depression until after his termination. There is none.

"Even if Plaintiff's testimony is accepted as true, at most all Plaintiff has done is provide some amorphous and context-specific statements about certain emotional difficulties he was having as a consequence of his divorce and/or related financial difficulties, such as not being able to sell his over one-million dollar house in Hawaii in the amount of time he had hoped after relocating to Tucson, . . . ." (D's MSJ at 21-22.) As a matter of law, Defendant did not violate the ADA when it terminated the Plaintiff for any or all of the following reasons: compulsive gambling, untrustworthiness, and/or security clearance issues.

Because the Plaintiff fails to establish a *prima facie* case of discrimination, the burden never shifts to Defendant to put forward a legitimate, non-discriminatory reason for terminating his employment. *Snead v. Metro Prop. & Cas. Insur. Comp.*, 237 F.3d 1080, 1039 (9th Cir. 2001). The Court does not need to consider the merits of Defendant's assertion that it terminated the Plaintiff's employment "because of his gambling, his gambling-related debts, his criminal problems, and his failure to report to Raytheon each of these, *despite twenty-seven years of training that clearly informed him that he was absolutely required to*, Plaintiff . . . could not be trusted to perform the essential functions of his security-sensitive position." *Id.* at 23 (emphasis in original).

On summary judgment, the moving party is entitled to judgment as a matter of law, if the Court determines that in the record before it there exists "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247- 48 (1986). A material fact is any factual dispute that might affect the outcome of the case under the governing substantive law. *Id.* at 248. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the nonmoving party. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, but is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986). A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial. *Anderson*, 477 U.S. at 250. "If evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted." *Eisenberg v. Insurance Co. of North Am.*, 815 F. 2d 1285, 1288 (9th Cir. 1987). In determining whether to grant summary judgment, the Court views the facts and inferences from these facts in the light most favorable to the nonmoving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577, (1986).

The Judge's role on a motion for summary judgment is not to determine the truth of the matter, weigh the evidence, or determine credibility, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The inquiry mirrors the standard for a directed verdict: whether the evidence presented reveals a factual disagreement requiring submission to a jury or whether the evidence is so one sided that one party must prevail as a matter of law. *Id.* Here, Plaintiff fails to present any evidence to support his claim that his employment was terminated due to a disability. Defendant is entitled to summary judgment in this case.

**Accordingly,**

**IT IS ORDERED** the Motion to Strike Defendant's Reply (doc. 94) is DENIED AS MOOT.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment (doc. 80) is GRANTED.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter Judgment accordingly for Defendant and against Plaintiff.

DATED this 23rd day of June, 2010.

David C. Bury
United States District Judge